UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR A CRIMINAL COMPLAINT CHARGING WILSON MIGUEL SUERO GIL WITH A VIOLATION OF 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), AND 841(b)(1)(B)(ii)(II) | ) ) ) ) ) ) M.J. No. 21-7261-JCB |

AFFIDAVIT IN SUPPORT OF APPLICATION

I, Special Agent Eugene M. DiFiore, being duly sworn, depose and state as follows:

1. I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 2005. Since that time, I have been assigned to the New England Division. I am currently assigned to Task Force 2, based in Boston, Massachusetts. Prior to my employment with the DEA, I was employed as a Police Officer with the City of Methuen (Massachusetts) from 1995 to 1999, after which I transferred to the Amesbury Police Department in Amesbury, Massachusetts from 1999 until accepting a position as a criminal investigator with the Drug Enforcement Administration in February of 2005.

2. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I

have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of an Application for a criminal complaint charging Wilson Miguel SUERO GIL ("SUERO GIL") with violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) and 841(b)(1)(B)(ii) (possession with intent to distribute 400 grams or more of fentanyl and possession with intent to distribute 500 grams or more of cocaine).

5. I have personally participated in the investigation of SUERO GIL as outlined in this affidavit. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

6. This Affidavit is submitted for the limited purpose of establishing probable cause to believe that SUERO GIL has committed the above offenses. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## EVIDENCE IN SUPPORT OF PROBABLE CAUSE

7. On or about November 4, 2021, agents received information from a source of information (hereinafter, the "SOI") that a Hispanic male named Eddie Santos ("Santos") who resides at 52 Ashland Avenue in Methuen, Massachusetts was holding a package of suspected narcotics in abeyance for money owed to him. The SOI wishes to remain anonymous out of concern for the SOI's safety. The SOI has a criminal history that includes a prior drug conviction.

The SOI is cooperating with law enforcement in the hopes of receiving consideration on this charge. Information provided by the SOI is corroborated as detailed herein and therefore the SOI is believed to be reliable.

8.      Specifically, the SOI indicated that the SOI did not know why or how much money was owed to Santos; however, the SOI was aware that Santos was holding the suspected narcotics. The SOI indicated that an unknown Hispanic male would arrive at 52 Ashland Avenue in Methuen, Massachusetts to settle the alleged debt and to collect the suspected narcotics. The SOI did not know the name of the unknown Hispanic male, but did provide the following description of him to agents: approximately 5'10" and no taller than 6' in height, heavier set and stocky build, with a faded haircut and a light growth in the beard area. The SOI understood that the unknown Hispanic male utilized taxi or car services for transportation and did not know the unknown Hispanic male to possess or drive a vehicle.

9.      After learning the above from the SOI, agents viewed a Massachusetts Registry of Motor Vehicle ("RMV") photograph for Santos, which listed an address of 52 Ashland Avenue in Methuen, Massachusetts.

10.     The address of 50-52 Ashland Avenue is a multifamily house with two to two and a half stories with light blue siding with white trim. There are stairs up to the front porch that lead to two white front doors. There is a "50" to the left of the door on the left and a "52" to the right of the door on the right. To the left of the house is Almont Street. On the left side of the house, that is, on the Almont Street side of the house, there is a long walkway that leads to a first-floor porch set further back on the house. Directly above this porch is a screened in, covered and enclosed porch on and accessible from the second floor. The inside of this second floor porch is visible from Ashland Avenue.

11. Based upon information provided by the SOI, agents established surveillance at Santos's residence of 52 Ashland Avenue on November 4, 2021. At approximately 5:50 p.m. that evening, agents observed two Hispanic males drinking on the second floor screened in porch on the Almont Street side of the house. Agents believed one of the men was Santos after having previously viewed an RMV photograph for him. The other man was a heavier set Hispanic male with a stocky build and a faded haircut. Based upon the information received from the SOI, I believed that the other male was the male who intended to pick up the narcotics from 52 Ashland Avenue.

12. At approximately 7:15 p.m., both men left the second floor screened in porch and appeared to go inside the house from a door accessible to the second floor. Shortly after the two men left the porch, agents observed the front door of 52 Ashland Avenue open. Both Santos and the unknown Hispanic male stood at the front door area of 52 Ashland Avenue. The unknown Hispanic male walked out of 52 Ashland Avenue and placed both a midsized suitcase and a white shoe-box-sized box on the landing of the front porch. While the unknown Hispanic male was moving the suitcase and box to the porch, Santos stayed within the doorway area of 52 Ashland Avenue and left the door open. Once the box and suitcase were on the porch, the unknown Hispanic male walked down the stairs, without the box and suitcase, and stood at the sidewalk area of Ashland Avenue in front of 52 Ashland Avenue. At that time, the unknown Hispanic male looked up and down the street as if he was waiting for someone to arrive. Santos also was looking around outside and up and down the street.

13. Less than five minutes later, at approximately 7:20 p.m., agents saw a metallic brown colored 2010 Dodge Caravan minivan (registered to Liberty Taxi, 264 Lowell Street in Lawrence, Massachusetts with registration number 851F and medallion number 142) with a clearly

displayed "Liberty Taxi" emblem on the vehicle (hereinafter the "minivan Taxi") arrive in the area. The minivan Taxi pulled onto Ashland Avenue from Craven Avenue and drove past 52 Ashland Avenue, and upon reaching the house right after 52 Ashland Avenue, it conducted a three-point turn on Ashland Avenue and stopped directly in front of 52 Ashland Avenue. During this time, the unknown Hispanic male remained standing on the sidewalk in front of 52 Ashland Avenue.

14.     Once the minivan Taxi stopped in front of 52 Ashland Avenue, the unknown Hispanic male opened the passenger side back sliding door of the minivan Taxi. The unknown Hispanic male then walked back up to 52 Ashland Avenue and up the stairs and onto the front porch. The Hispanic male retrieved the suitcase and the white box, walked back down from the porch and directly to the minivan Taxi, and loaded both the suitcase and the white box into the open back passenger side compartment section of the minivan Taxi. Once the suitcase and the white box were inside the back passenger side compartment area of the minivan Taxi, the unknown Hispanic male also entered the back passenger side of the minivan. The door of the minivan Taxi closed. Santos, still at the front door of 52 Ashland Avenue looked up and down the street again and shut the front door of 52 Ashland Avenue.

15.     The minivan Taxi drove on Ashland Avenue towards Craven Avenue, took a right onto Craven Avenue, a left onto Gill Avenue, and a right onto Railroad, which became Currant Hill Road in Lawrence, Massachusetts.  Law enforcement maintained surveillance on the minivan Taxi as it traveled from Methuen to Lawrence and within Lawrence in a circuitous pattern. Based upon training and experience, it appeared that the vehicle was driving in this manner to determine whether it was under law enforcement surveillance.  The minivan Taxi then travelled on Currant Hill Road until it became May Street after a rotary. The minivan Taxi then took a left onto Railroad

Street in Lawrence, a left onto Haverhill Street, a right onto Morton Street, a left onto Lowell Street, a right onto Winter Street, a left onto Essex Street and a right onto Broadway and crossed over the Merrimack River. The minivan Taxi took a left onto Merrimack Street, a right on Carver Street, and a left onto Salem Street and crossed over Parker Street.

16. As the minivan Taxi crossed over Parker Street on Salem Street, Task Force Officers and agents assigned to DEA Task Force 2 activated their lights and sirens and effectuated a stop.

17. Agents approached the minivan Taxi. The only two occupants were the Taxi driver[1] and the unknown Hispanic male in the back passenger seat. The unknown Hispanic male exited the minivan Taxi at law enforcement's request. Law enforcement directed him away from the minivan Taxi. He was not in handcuffs. An agent asked what had happened that night, to which the unknown Hispanic male indicated that he did not speak English. A Spanish-speaking officer was summonsed over, and he asked the unknown Hispanic male in Spanish if he spoke English, to which the unknown Hispanic male responded in English that he did. In English, agents asked the unknown Hispanic male what was going on that night, to which he replied, "Nothing I am just coming from my friend's." He was asked where his friend lived, to which he replied, "Methuen." He was asked where in Methuen, to which he indicated, "I don't know. Methuen." He was asked where he was going, to which he replied, "A friend's." He was asked if he had ever been in trouble before, and he stated in response, "Reentry," which I took to mean that he was unlawfully present in the country.

---

[1] The identity of the taxi driver is known to law enforcement.

18. In the back passenger compartment area of the minivan Taxi, agents saw the suitcase and white box, which were the only two items in the back passenger compartment area of the minivan Taxi. The suitcase and white box were the same items that agents had watched the unknown Hispanic man take from 52 Ashland Avenue and put onto the front porch and then move from the front porch and put into the back passenger compartment area of the minivan Taxi. Agents opened the suitcase and the white box and viewed what they believed, based on their training and experience, to be multiple brick-sized packages of suspected narcotics. The suitcase and white box and suspected narcotics contained within then were seized and taken to the Lawrence Police Department.

19. The unknown Hispanic male was identified via a Dominican Republic Cedula identification card in the name of Wilson Miguel SUERO GIL bearing his photograph found in his wallet. Agents seized two cell phones from SUERO GIL.

20. SUERO GIL was handcuffed and put into a police vehicle and transported to the Lawrence Police Department for booking.

21. Agents spoke with the driver of the minivan Taxi, who confirmed that SUERO GIL entered the minivan Taxi with the suitcase and white box that agents had recovered from the passenger side back compartment of the minivan Taxi. The cab driver further confirmed that nothing else was left in the back by himself or any other prior clients. The cab driver said he picked SUERO GIL up and believed SUERO GIL was going to SUERO GIL's home, which the cab driver believed was in the area of 97 Osgood Street in Lawrence based upon the fact that the cab driver has personally dropped SUERO GIL off in the vicinity of this address on prior occasions.

22. Once at the Lawrence Police Department, agents further reviewed the multiple brick-like packages of suspected narcotics. There were a total of twenty-four brick-like objects

wrapped in cellophane.  Twenty-two of them were inside the suitcase, and two were inside the white box. All were approximately the same shape, size and weight.

23. All twenty-four brick objects appeared to contain a powdery substance pressed into a brick form and were wrapped in a black tape or black carbon paper which was further tightly wrapped in clear cellophane with additional marks of blue painters tape on one edge. Of the twenty-four bricks, nineteen had black writing on them that stated "L-19." The other five bricks had a brown coffee ground-like substance underneath the layer of cellophane wrapping.

24. Law enforcement used a TruNarc device to conduct field tests of two of the bricks of suspected narcotics. These two contained a white to an off-white pressed powdery substance. One of the bricks, which had the L-19 label, field tested positive for the presence of fentanyl. One of the bricks, which had the brown coffee ground like substance inside a layer of cellophane, field tested positive for cocaine.  Based upon my training and experience, I believe that each brick contained approximately one kilogram of narcotics. Also based upon my training and experience, I believe that possession of twenty-four kilograms of drugs is consistent with intent to distribute and not with personal use.

//

//

//

//

//

//

//

//

CONCLUSION

25. Based on the foregoing, there is probable cause to believe that on or about November 4, 2021, SUERO GIL did knowingly and intentionally possess with intent to distribute 400 or more grams of fentanyl and 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) and 841(b)(1)(B)(ii). Accordingly, I respectfully request the Court issue a criminal complaint charging SUERO GIL with possession with intent to distribute 400 or more grams of fentanyl and 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) and 841(b)(1)(B)(ii).

I declare that the foregoing is true and correct.

*Eugene M DiFiore*
_____
Eugene M. DiFiore
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Cr. P. 4.1 this 5th day of November 2021.

_____
HONORABLE JENNIFER C. BOAL
United States Magistrate Judge
District of Massachusetts